**Frank J. LAIRD, Petitioner,**

v.

**INTERSTATE COMMERCE COMMIS-SION and United States of America, Respondents,**

**The Kansas City Southern Railway Company, Intervenor.**

**No. 82–3076.**

United States Court of Appeals, Third Circuit.

Argued Sept. 28, 1982.

Decided Oct. 14, 1982.

William F. Baxter, Asst. Atty. Gen., John J. Powers, III, Kenneth P. Kolson, Attys., Dept. of Justice, Washington, D. C., Tom P. Monteverde, (argued), Albert W. Sheppard, Jr., Monteverde, Hemphill, Maschmeyer & Obert, Philadelphia, Pa., for petitioner.

John Broadley, Gen. Counsel, Ellen D. Hanson, Associate Gen. Counsel, Edward J. O'Meara (argued), Atty., I. C. C., Washington, D. C., for respondents.

Michael J. Glasheen (argued), Stephen W. Miller, Mary M. Rogers, Clark, Ladner, Fortenbaugh & Young, Philadelphia, Pa., for intervenor.

Before ALDISERT and HIGGINBOTHAM, Circuit Judges, and MEANOR,* District Judge.

## OPINION OF THE COURT

ALDISERT, Circuit Judge.

This petition, filed by a protesting minority shareholder, asks us to review the Interstate Commerce Commission's approval of a transaction of the Kansas City Southern Railway Company involving a reverse stock split coupled with the purchase of any resulting fractional shares. We are required to decide: whether there is substantial evidence in the record as a whole to support the Commission's findings that the transaction was for a proper corporate purpose and that adequate compensation was offered for the fractional shares; whether the Commission selected the proper legal precepts in determining that the transaction was for a lawful corporate object; and whether the Commission abused its discretion in denying Petitioner's requests for extensive discovery and an oral hearing. Because we conclude that the Commission neither erred nor abused its discretion, we will deny the petition.

---

* Honorable H. Curtis Meanor, of the United States District Court for the District of New Jersey, sitting by designation.

## I.

The Kansas City Southern Railway Company, a Missouri corporation and Intervenor here, had 1,440,000 shares of stock outstanding; of these, 420,000 were preferred shares and 1,020,000 were common. Kansas City Southern Industries, Inc., the railway company's parent company, owned or controlled 98% of the preferred stock and 99% of common. Seventy minority shareholders held the remaining 7,418 preferred shares and twenty-eight minority shareholders held the remaining 1,948 common shares. On February 26, 1981, the railway company filed an application with the ICC, pursuant to 49 U.S.C. § 11301, for authority to reissue its securities to effect a reverse stock split.[1] The proposal would allow the railway company to issue one share of new preferred stock for every 7,000 shares of old preferred and one share of new common stock for every 2,000 shares of old common. The plan also called for the purchase, by the railway company, of any resulting fractional shares at $30 per share for the preferred and $210 per share for the common. It is not disputed that this transaction would eliminate all minority shareholders.

Petitioner Frank J. Laird, a Pennsylvania resident, owned 1,069 shares of the railway company's common stock and opposed ICC approval of the transaction. He claimed that the evidence was insufficient to support a finding either that the transaction was for a proper "corporate purpose" or that the proposed compensation for frac-

tional shares was adequate (and thus the transaction was not "reasonably appropriate" for that corporate purpose); that the transaction was not for a "lawful object"; and that the Commission abused its discretion in denying his motions for extensive discovery and an oral hearing. Laird argues these same points on appeal. The first two claims relate to the manner in which the Commission fulfilled its statutory duty under 49 U.S.C. § 11301.[2] The third refers to the manner in which the Commission applied its own procedural rules.

On February 8, 1982, after determining that the transaction met federal statutory standards and was legal under the corporation law of Missouri, and after granting Laird limited discovery but denying his request for an oral hearing, the ICC approved the transaction. Laird then filed this petition for review.

This court has jurisdiction under 28 U.S.C. § 2342(5) to review the Commission's order.[3] We have permitted the railway company to intervene.

## II.

### A.

Laird first asserts that there was insufficient evidence to support the Commission's findings either that the stock split was for a proper corporate purpose of the carrier or that the compensation offered for fractional shares was adequate. In considering the sufficiency of evidence in sup-

1. Section 11301(b)(1) provides:
   [T]he Commission has exclusive jurisdiction to approve the issuance of securities by a carrier .... A carrier may not issue securities ... without the approval of the Commission.

2. Under 49 U.S.C. § 11301(d)(1)(A)–(D), the Commission may approve such an application only when it finds that the issuance
   (A) is for a lawful object within the corporate purpose of the carrier and reasonably appropriate for that purpose;
   (B) is compatible with the public interest;
   (C) is appropriate for or consistent with the proper performance by the carrier of service to the public as a common carrier; and
   (D) will not impair the financial ability of the carrier to provide the service.

Here the Commission specifically found that all of these statutory requirements were satisfied.

3. Section 2342(5) provides:
   The court of appeals has exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of—
   ....
   (5) all rules, regulations, or final orders of the Interstate Commerce Commission ....
   In addition, Petitioner has complied with the provisions of 28 U.S.C. §§ 2343 ("venue of a proceeding under this chapter is in the judicial circuit in which the petitioner resides ...") and 2344 ("[a]ny party aggrieved by the final order [of the ICC] may, within 60 days after its entry, file a petition to review the order in the court of appeals wherein venue lies").

port of an agency ruling our review is limited. The Commission's order will be upheld unless it is found to be arbitrary, capricious, an abuse of discretion, or unsupported by substantial evidence. 5 U.S.C. § 706(2)(A), (E); *see Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 285, 95 S.Ct. 438, 441, 42 L.Ed.2d 447 (1974). Further, in reviewing an ICC order, this court will not reweigh the evidence presented before the Commission. It is for the Commission, as the trier of fact, to weigh the evidence and draw the appropriate inferences therefrom. *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, —— U.S. ——, ——, 102 S.Ct. 2182, 2190, 72 L.Ed.2d 606 (1982); *Ralston Purina v. Louisville & N. R. R.*, 426 U.S. 476, 96 S.Ct. 2160, 48 L.Ed.2d 781 (1976); *Universal Minerals, Inc. v. C. A. Hughes & Co.*, 669 F.2d 98, 103 (3d Cir. 1981). Our task is merely to determine if there is substantial evidence in the record to support the basic and inferred facts found by the administrative agency. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." [4] *Consolo v. Federal Maritime Commission*, 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)).

### 1.

■ Arguing to the ICC that the proposed transaction was for a proper corporate purpose, the railway company stated that the elimination of minority shareholders would (1) obviate the expense of maintaining the capability of communicating with, reporting to, keeping records for, transferring stock of, and otherwise continuing to maintain a support system for the small number of minority shareholders; (2) eliminate the possibility of any conflicts of interest between minority shareholders and the parent corporation; and (3) facilitate potential mergers or acquisitions involving the railway company as a target. As he contended to the ICC, Laird now objects that the railway company did not prove either that the freezeout of minority shareholders would effectuate anything more than minimal savings or that there had been any concrete evidence of a conflict of interest in the past. We find these objections meritless.

The railway company offered evidence to the Commission to support its contention that the transaction was for a proper corporate purpose. This evidence, consisting of the three arguments recited above, while not so substantial as to compel the ICC finding of proper corporate purpose, is sufficiently substantial to support that finding. Moreover, as the railway company points out, Laird does not now contest the accuracy of that evidence; his only contention is that it was, in his opinion, insufficient. Further, we can find no authority establishing either a requirement that elimination of an unnecessary expense (*i.e.*, the minority shareholder support system) must effect anything more than minimal corporate savings in order to be deemed a proper corporate purpose, or that the avoidance of po-

---

**4.** "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938); substantial evidence means that "affording a substantial basis of fact from which the fact in issue can be reasonably inferred. . . . [I]t must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury," *NLRB v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 299–300, 59 S.Ct. 501, 504, 505, 83 L.Ed. 660 (1939). Under the substantial evidence standard, a reviewing court does not reweigh the evidence, resolve testimonial conflicts, or "displace the Board's choice between two fairly conflicting views, even though the court could justifiably have made a different choice had the matter been before it *de novo*." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951). Thus a reviewing court does not reweigh the evidence or reject reasonable agency inferences simply because other inferences might also have been reasonably drawn. *See NLRB v. Walton Mfg. Co.*, 369 U.S. 404, 405, 82 S.Ct. 853, 854, 7 L.Ed.2d 829 (1962); *NLRB v. Lewisburg Chair & Furniture Co.*, 230 F.2d 155, 157 (3d Cir. 1956).

tential, as distinguished from actual, conflicts of interest is insufficient to be deemed a proper corporate purpose under § 11301.

We hold, therefore, that there is substantial evidence in the record as a whole to support the ICC findings that the reverse stock split was for a proper "corporate purpose" of the railway company.

### 2.

■ Laird also argues that even were the transaction for a proper corporate purpose, the evidence to support a finding that it was "reasonably appropriate" for that purpose was insufficient because the compensation offered for the fractional shares was inadequate. The compensation figures used by the railway company were based on a valuation report prepared for it by the investment banking firm of Kidder, Peabody & Co. Laird attacks this report on several grounds: (1) that the report was cursory and represented only a minimal undertaking, accomplished for only $5,000; (2) that Kidder, Peabody was biased in favor of the railway company because it had recently done work for the parent corporation; and (3) that instead of using the valuation methodologies it chose, Kidder, Peabody should have valued the railway company as a "going concern." We also find no merit in these objections.

The charges that the report was cursory and that Kidder, Peabody was biased are both groundless. First, Kidder, Peabody was able to prepare the report for only $5,000 precisely because it had done prior work for the parent corporation and was familiar with the operations of the railway company. Also, a report such as this, which fully explains the basis for its recommendations, can be judged on its own merits and thereby withstand an allegation of bias. Further, the charge that the report should have relied on a different valuation methodology ignores what Kidder, Peabody actually did. Kidder, Peabody used several standard valuation methods, including capitalization of earnings, and recommended a per share value range of $170 to $200 per share for the common stock and of $18 to $22 per share for the preferred stock. The

railway company's board of directors then increased these amounts to $210 for common and $30 for preferred. The Commission found that both the Kidder, Peabody recommendations and the somewhat more generous board of directors offers were reasonable. Also, because courts have recognized that capitalized earnings is a proper method of stock valuation, *Schwabacher v. United States,* 334 U.S. 182, 68 S.Ct. 958, 92 L.Ed. 1305 (1948), *Gabriel v. United States,* 416 F.Supp. 810 (D.N.J.), *aff'd mem.,* 429 U.S. 1011, 97 S.Ct. 634, 50 L.Ed.2d 621 (1976), the Commission determined that the valuation method used by Kidder, Peabody was acceptable. Further, as stated by the ICC in its final order "[o]ther than general comments that the value is inadequate, protestant has not submitted expert authority computing his own value or refuting that of applicant's expert. Protestant's mere statements are insufficient for us to ignore the professional opinion submitted by applicant." Petitioner's Appendix at 349. Therefore, finding both the methodology employed by Kidder, Peabody to be acceptable and the valuation reasonable, and noting that Laird failed to submit any expert testimony to rebut the evidence in support of either finding, the Commission concluded that the proposed compensation was just and adequate.

As noted above our inquiry in a petition for review of a decision by an administrative agency is narrow. We hold that there is substantial evidence to support the Commission's findings that the compensation offered for fractional shares was adequate and that the transaction was "reasonably appropriate" for a proper corporate purpose.

### B.

■ Petitioner next contends that the reverse stock split as proposed by the railway company is illegal and that the ICC's determination that the transaction was allowable under Missouri corporation law was error. To support these contentions Petitioner asserts in his brief before this court that, although he could find "no case decided

under 49 U.S.C. § 11301 nor any Missouri decision directly on point," the "majority and enlightened view" holds that "a reverse stock split whose sole purpose is the elimination of the minority shareholders is not lawful." As authority, Petitioner cites several decisions construing Pennsylvania and Delaware corporation law, including our decisions *Dower v. Mosser Industries, Inc.,* 648 F.2d 183 (3d Cir. 1981) (Pennsylvania law) and *Coleman v. Taub,* 638 F.2d 628 (3d Cir. 1981) (Delaware law).

The Commission and the railway company respond that because the railway company is a Missouri corporation, the ICC properly relied on Missouri corporation law in determining that the transaction was legal. Further, they argue that even if the ICC should have considered the decisions construing Pennsylvania and Delaware corporation law cited by Petitioner, those cases do not support Petitioner's contentions.[5] In *Dower,* for example, after noting that majority shareholders owe a fiduciary duty to minority shareholders, we concluded that the presence of this fiduciary duty "does not prevent a cash out under Pennsylvania law. There must be found a fundamental unfairness before such [a transaction] may be enjoined by the courts."[6] 648 F.2d at 190. Finally, Respondent and Intervenor argue that even if the Delaware and Pennsylvania decisions did support Petitioner's view, and were appropriate for consideration by the ICC, they would be inapposite here because freezing out the minority interests was not the sole purpose of the subject transaction.

If, in deciding the legality of this transaction, the ICC's choice of law was only between competing legal precepts from state corporation law, then we would quickly uphold the Commission's determination on the

basis of Respondent's and Intervenor's arguments recited above. We are of the opinion, however, that Petitioner's contentions cut more deeply than that. Although Petitioner's objection to the Commission's use of Missouri law is unclear, he apparently questions the Commission's reliance on any state law in support of its determination and argues that the ICC is obliged to apply a federal standard of corporate responsibility. This contention would normally present two questions: whether the Commission chose the correct legal precept by which to judge the legality of the proposed transaction and, if so, whether it properly applied that precept to the facts. But, as will be discussed later, our analysis need not progress beyond the first question. As to the choice of the proper legal precept our standard of review is plenary. *Consolidated Rail Corp. v. United States,* 619 F.2d 988 (3d Cir. 1980).

In the context of the Interstate Commerce Act, choice of law is a difficult question involving subtle interplay between the doctrine of preemption and the incorporation of state law into federal statutory schemes. For cases within its jurisdiction, the authority of the ICC is "plenary and exclusive and independent of all other state and federal authority." *Schwabacher v. United States,* 334 U.S. 182, 197, 68 S.Ct. 958, 966, 92 L.Ed. 1305 (1948). Further, the Supreme Court has stated that, in carrying out its statutory mandate,

> the Commission must look for standards . . . only to the Interstate Commerce Act. In matters within its scope it is the supreme law of the land. . . . The Commission likely would not and probably could not be given plenary and exclusive jurisdiction to interpret and apply any state's law. Whatever rights the appellants ask the Commission to assure must be founded on federal, not on state, law.

---

**5.** Petitioner does not clearly state why the ICC should have considered decisions construing either Pennsylvania or Delaware corporation law. As discussed later, we understand Petitioner to argue that the Pennsylvania and Delaware cases represent a higher level of fiduciary duty than that which exists under Missouri law and that the ICC should have drawn on these decisions in developing a federal standard for application in this case.

**6.** *Coleman* is somewhat closer to Petitioner's mark. There we construed Delaware law as allowing a cash out of minority interests provided there was a business purpose, but determined that, under Delaware law, a business purpose related solely to the interests of the majority shareholders was sufficient. 638 F.2d at 634.

*Id.* at 198, 68 S.Ct. at 966. In light of *Schwabacher,* the Petitioner here properly questions the Commission's apparent reliance on Missouri corporation law.

The usual rule is that when Congress adopts a federal statutory scheme (*e.g.,* the Interstate Commerce Act) it "normally intends that [the scheme] shall operate uniformly throughout the nation . . . ." *Reconstruction Finance Corp. v. Beaver County,* 328 U.S. 204, 209, 66 S.Ct. 992, 995, 90 L.Ed. 1172 (1946) (citing *Jerome v. United States,* 318 U.S. 101, 104, 63 S.Ct. 483, 485, 87 L.Ed. 640 (1943)). And when that federal statutory scheme does not indicate which law is to be applied in carrying out its commands (and when reliance on state law could jeopardize the desired uniformity of operation) courts have adopted a federal rule for consistent application. *Id.* 328 U.S. at 208–09, 66 S.Ct. at 994–995. Not every statutory scheme requires a uniform federal rule, however, and in a variety of circumstances state law has been relied on, and thereby incorporated into the federal statutory scheme. *See, e.g., Reconstruction Finance Corporation; United States v. Burnison,* 339 U.S. 87, 70 S.Ct. 503, 94 L.Ed. 675 (1950).

The instant petition presents the issue of incorporation of state law in a slightly different light. Here, the normal rule favoring uniformity of consequences through the consistent application of a single set of legal precepts confronts the countervailing reality that there is no general, comprehensive federal corporation law upon which a court or administrative agency can draw. And, although the ICC would be within its power to establish, as Petitioner here proposes, a federal standard of fiduciary duty

owed by majority shareholders to minority shareholders, which would be more stringent than available under most state law, recent United States Supreme Court precedent militates strongly against such a move. *See Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977).[7]

In the instant case, because there is no established body of federal substantive law in an area where federal standards must form the basis of decisions, the ICC chose to rely nominally on state law. In so doing, the Commission impliedly incorporated state law into a federal statutory scheme. Thus, the federal standard for determining the legality of a transaction proposed by a carrier subject to ICC jurisdiction is whether, in the Commission's view, that transaction is for a lawful object under the law of the state of incorporation. Thus viewed, the ICC did as the Petitioner demands, and as it was legally bound to do: it formulated a federal standard to determine the legality of the proposed transaction.

As we read Petitioner's objections, he does not present an alternative argument that, assuming the Commission's *choice* of Missouri law as the controlling federal precept was correct, its *application* of that law to the facts was error. We need not consider, therefore, whether the correctly chosen legal precept was also correctly applied, although in passing we note that the Commission's determination of the transaction's legality under the law of Missouri is ably done.

We hold, therefore, that the Commission selected the proper legal precept to determine if the proposed transaction was for a "lawful object."

**7.** *Santa Fe* involved the merger of a subsidiary corporation into its parent, Santa Fe, a Delaware corporation. The parent owned 95% of the subsidiary's shares and, under Delaware corporation law, the merger could be accomplished without the approval of the shareholders of either corporation. As part of the merger, Santa Fe told the subsidiary's minority shareholders that they would be cashed out. Green, a minority shareholder, sued in federal court under § 10(b) of the 1934 Securities Exchange Act alleging "fraud" because of undervaluation of the shares. The Supreme Court held that the transaction was neither deceptive nor manipulative and thus did not violate § 10(b) of the Securities and Exchange Act of 1934. In so doing the Court refused to create a general federal standard of fraud to govern the fiduciary relationship between majority and minority shareholders in a merger/cash out situation. By analogy, the ICC has correctly refrained from establishing a general federal standard to govern the fiduciary relationship between majority and minority shareholders in a reverse stock split/fractional share purchase situation.

### III.

We now turn to Laird's attack on the ICC procedures. Laird argues that the Commission abused its discretion and wrongfully denied his request for full discovery. As a result, he asserts, he was prevented from establishing that material facts were in dispute and, therefore, the Commission's further denial of his request for an oral hearing was also wrongful and an abuse of discretion. We disagree.

█ At the onset we note that the formulation of administrative procedures is a matter left to the discretion of the administrative agency. *Vermont Yankee Nuclear Power Corp. v. National Resources Defense Council, Inc.,* 435 U.S. 519, 523–25, 98 S.Ct. 1197, 1201–1202, 55 L.Ed.2d 460 (1978). Further, because an administrative agency is not required to hold adversarial hearings as part of its dispute resolution process, *Titusville Cable v. United States,* 404 F.2d 1187, 1192 (3d Cir. 1968), it has considerable latitude as to how, through its procedural rules, it wishes to structure the presentation of evidence prior to resolving a particular issue.

█ The rules of the ICC allow it to hear disputes using a "modified procedure," when "it appears that substantially all important issues of material fact may be resolved by means of written materials." 49 C.F.R. § 1100.43. When the "modified procedure" is used, parties must submit verified statements of fact directly to the ICC, *id.* § 1100.48, and "[u]nless material facts are in dispute, [an] oral hearing will not be held . . . ." *Id.* § 1100.51. Also, discovery procedures, such as the taking of depositions or the production of documents, must receive Commission approval and a petition requesting such approval "must be filed in sufficient time to allow for the filing of replies and for consideration by the Commission without requiring the postponement of any established date . . . for submission of initial statements under modified procedure." *Id.* § 1100.55. Finally, a party requesting discovery must, pursuant to 49 C.F.R. § 1100.56, "set forth the facts it expects to establish and the substance it expects to elicit."

The ICC decided that the factual issues could be resolved under the Commission's modified procedures. Laird disagreed. He sought to depose five witnesses and to have the railway company and Kidder, Peabody directed to produce numerous documents. He also requested an oral hearing. The Commission allowed Laird to serve interrogatories on one of the witnesses and ordered Kidder, Peabody to produce the requested documents, but it denied the remainder of his requests.

Laird concedes that the courts have upheld the Commission's authority to handle certain applications through its "modified procedure" rules. *See Crete Carrier Corp. v. United States,* 577 F.2d 49 (8th Cir. 1978); *Subler Transfer, Inc. v. United States,* 396 F.Supp. 762, 765 (S.D. Ohio 1975). Nevertheless, he asserts that in this case the use of these rules prevented him from developing adequately his arguments in opposition to the proposed transaction. Laird failed, however, in both his motions before the ICC and his brief to this court, to specify how the denied discovery and oral hearing would have allowed him to develop those arguments. The sheer volume of documents requested indicates more a person in search of an argument than one in search of support for an established position.[8] The Com-

---

**8.** Petitioner requested a multitude of documents from the railway company, including all records relating to transfers of its stock, all records relating to communications with the common and preferred shareholders, all records relating to lost stock certificates, all correspondence relating to communications with, and payments for services rendered by Applicant's stock transfer agent, and all records reflecting any anticipated savings in personnel or overhead costs which would result from the elimination of the railway company's minority shareholders.

In addition, Petitioner requested production of many documents of Kidder, Peabody & Co., including all materials and information provided by the railway company and/or its parent in connection with Kidder, Peabody's attempt to determine the fair value of the minority interests, all communications or correspondence relating to the work actually performed by Kidder, Peabody & Co. in evaluating the interests

mission concluded that the requested production of documents would be excessively burdensome and expensive, and that Laird had failed to demonstrate the relevancy of many of the documents. The Commission stated that, based on the information provided by Laird, it would not authorize a "fishing expedition" into the railway company's books. Considering the breadth of Petitioner's discovery requests and the dearth of justification he provides, we hold that the ICC did not abuse its discretion in reaching this conclusion.

 Finally, the ICC is not required to hold an oral hearing unless material facts are in dispute and the verified statements do not provide an adequate basis for the resolution. 49 C.F.R. § 1100.43; see Crete Carrier Corp. v. United States, 557 F.2d 49, 50 (8th Cir. 1978). Laird, both in his request for oral argument before the Commission and in his petition for review before this court, failed to offer any expert or substantive evidence to dispute the issues of business purpose or adequacy of compensation, or any expert or substantive evidence to support the asserted reasons for the necessity of an oral hearing. His "evidence" consists only of his own statements of personal opinion. We fail to see, therefore, where Laird has placed any material issue sufficiently in dispute to move this court to reverse the Commission's decision and to require an oral hearing before the ICC. Accordingly, we hold that the ICC did not abuse its discretion in determining that disputed issues could be resolved on the basis of the verified statements of the parties and that an oral hearing was unnecessary.

## IV.

We have considered all the contentions presented by the petitioner and find not one of them meritorious. The petition for review will be denied.

of the minority shareholders, all records and worksheets reflecting the time spent and compensation received by Kidder, Peabody & Co. in connection with its appraisal or evaluation of minority stock interests, and all records pertaining to any reports sent out to, or studies

conducted for any railroad, for purposes of valuation or appraisal in connection with any proposed mergers and/or acquisitions.

For the complete list of all requested documents the reader is directed to the Petitioner's Appendix at 137a–41a.